## BOSTITCH, Inc. v. PRECISION STAPLE CORPORATION et al.

No. 55, Docket 21421.

United States Court of Appeals Second Circuit.

Argued Oct. 4, 1949.

Decided Dec. 12, 1949.

John P. Chandler, New York City, attorney for appellants.

George P. Dike, Boston, Mass., attorney for appellee; Dike, Calver & Porter, of Boston, Mass., and John W. Hoag and Hoag, Kilburn & Carlson, of New York City, on the brief.

Before L. HAND, Chief Judge and SWAN and CLARK, Circuit Judges.

SWAN, Circuit Judge.

This is a patent infringement suit based on two combination patents for improvements in manually operated stapler-fastening devices. The Goodstein patent, No. 2,-309,763, was granted February 2, 1943 on an application filed August 16, 1938. Claims 1, 2, 9 and 10 are in suit. The Maynard patent, No. 2,264,322 is for improvements on Goodstein's invention. Although granted earlier, December 2, 1941, the application was filed later, December 12, 1938, than the Goodstein application. Claims 2, 11, 12, 13, 14, 18, 20 and 24 of the Maynard patent are in suit. Both patents are owned by the appellee.[1] The district court found the claims in suit valid and infringed by the machine of the defendants.[2] They have appealed from the interlocutory decree. They contend (1) that the patents present no "invention" over the prior art; (2) that they do not define the alleged improvements with sufficient clarity to comply with 35 U.S.C.A. § 33; (3) that one of the patents is invalid because of double patenting; (4) that all the claims are void as being drawn to an exhausted combination; and (5) that recovery should be denied to plaintiff because of false patent marking. In the view we take the first contention is decisive.

The patents in suit relate to hand-operated stapling machines for fastening together by means of U-shaped wire staples sheets of paper or other materials through which the staples may be driven. It is an old art crowded with patents. At the date of Goodstein's application, two types of machines were on the market. Most of them were of the plunger type, in which the staple is driven home by a plunger set in a housing at right angles to the base of the machines, and the "magazine," which carries the stick of staples, is loaded through its rear end.[3] This construction produced a rather heavy and unwieldy machine. There was also a lever-type of machine which had no plunger and was loaded from the front. In both types the stick of staples rode on the "core" of the magazine and was pressed forward by means of a "pusher" and a spring toward the "throat," which guides the foremost staple when it is driven down into the paper or other material to be fastened. Front loading machines were not easy to load because the stick of staples had to be pushed in against the resistance of the pusher spring. In either type of machine, if a staple got jammed in the throat or in the magazine, there was difficulty in freeing it.

Goodstein's patent is for an improvement in the lever-type of machine. It has a base,

1. The suit was brought by Boston Wire Stitcher Company as assignee of the patentees. Thereafter Bostitch, Inc. became the plaintiff's assignee and was substituted as party plaintiff pursuant to Federal Rules of Civil Procedure, rule 25(c), 28 U.S.C.A.

2. Precision Staple Corporation manufactures the machines, General Staple Corporation sells them, and the individual defendant is the active head of both corporate defendants and owns patent No. 2,427,156, granted September 9, 1947 on application filed November 9, 1944, in accordance with which the accused machines were manufactured.

3. The wire staples are preformed and cemented together to form what is known as a "stick."

a magazine for carrying the supply of staples, and a lever for driving the foremost staple home. The base is a flat strip of metal on the forward end of which is formed the conventional anvil for clinching the ends of the staple after it has passed through the materials to be fastened together. The magazine is of channel shape and is pivoted to the rear end of the base. At the front end of the magazine a throat is formed by bending inwardly the side walls and upwardly the bottom wall. The magazine has no core; the feet of the staples rest on the bottom wall and the staples are fed to the throat by means of a pusher and spring. The top wall of the magazine serves both as a cover of the magazine and as a driver of the staples. It is hinged to the rear ends of the magazine and base, and may be moved in one direction to open the magazine for loading and in the opposite direction to close the magazine and to drive the staple. The lever carries on its forward end

a depending piece of metal which drives the staple through the throat and clinches it on the anvil of the base when the lever is pressed down to its full extent. The claims in suit are set forth in the margin.[4]

Goodstein's invention was purchased by the plaintiff and turned over to one of its engineers, Mr. Maynard, for development as a manufacturing proposition. He devised three mechanical improvements. He inserted a latch which limits the movement of the cover away from the magazine when the latch is in engagement but may be disengaged to swing the cover away for opening the magazine. Claim 2 is directed to this improvement.[5] He provided a simple method of manually locking the pusher-spring toward the rear of the magazine when it is opened for loading and automatically unlocking the spring when the cover is closed upon the magazine. Claims 11, 12, 13, 14 and 24 cover these features, claim 14 being typical.[6] He also inserted

4. "1. In a device of the type indicated, a channel-type magazine having an open side extending longitudinally thereof and parallel spaced-apart vertical flanges at one end forming a throat therebetween, said magazine being adapted to hold a supply of staples extending thereacross and supported therein by the engagement of the ends of their legs with the bottom wall thereof, a cover pivotally mounted on the magazine to overlie the open side of the latter, and staple-driving means carried by the cover and movable relatively of the magazine for driving the staples through the throat.

"2. In a device of the type indicated, a magazine having a bottom wall with one end folded upwardly and side walls with their ends folded inwardly in spaced relation to the folded end of the bottom wall to form a throat therebetween, said magazine being adapted to hold a supply of staples extending across the magazine and supported therein by the engagement of the ends of their legs with the bottom wall thereof, and staple-driving means movable relatively of the magazine for driving the staples through the throat."

"9. In a device of the type indicated, a magazine-arm for holding a supply of staples, said magazine-arm having a bottom wall with one end folded upwardly and side walls with their ends folded inwardly in parallel spaced relation to the folded end of the bottom wall to form a

throat therebetween, and staple-driving means movable relatively of the magazine for driving the staples through the throat.

"10. In a device of the type indicated, a magazine having an opening in its side extending longitudinally thereof through which staples may be supplied thereto, a lever movable relatively of the magazine for closing the opening therein, and a driver operated by the lever, said lever being movable toward the magazine to drive staples therefrom and away from the magazine to open the latter to receive a supply of staples through the opening in its side."

5. "2. In a device of the type indicated, a magazine having an open side extending longitudinally thereof, a lever movable relatively of the magazine for closing the open side thereof, a driver operative by the lever, said lever being movable toward the magazine to drive fasteners fed therefrom and away from the magazine to open the latter to receive a supply of fasteners through its open side, and means for retaining the lever in closed position on the magazine while permitting relative movement therebetween to apply the fasteners to the work."

6. "14. In a device of the type indicated, a magazine having an open side through which fasteners are supplied, a lever for closing the open side of the magazine,

a longitudinal rod to brace the shear plate, or upturned bottom-wall of the magazine, designed to strengthen the shear plate so as to permit the magazine to be made of thin, light metal. Claim 20 covers this feature.[7]

The machine made in accordance with the patents in suit is an inexpensive, small, compact, light weight device capable of being carried in pocket or handbag. The district judge found that "Its sales have outstripped in speed and volume the sales of earlier machines marketed by the plaintiff, indicating marked popular preference for it and a wide acceptance of it by the public." The number sold increased from 69,682 in the first year it was on the market, 1940, to 606,790 in 1947; for the same years the sales of the lever-type machine known as B-5, exhibit 6, which the plaintiff brought out in 1934, and is still selling, were 80,532 and 92,700. The machine of the patents in suit sells for $2.20 as against $6.95 for the B-5 machine; it has only 17 parts as against the latter's 30 parts.

■ Although the commercial success of the device is impressive, the Supreme Court has frequently warned, and again very recently, that commercial success can be considered only as a make-weight when the question of patentability is close. Jungersen v. Ostby & Barton Co., 335 U.S. 560,

567, 69 S.Ct. 269. With respect to the Maynard patent in suit the question of patentability is not close. We see nothing in the record to suggest that his improvements were beyond the range of a competent designer familiar with the art. The plaintiff's brief states that the plaintiff acquired Goodstein's invention in 1938. The exact date does not apepar but it must have been prior to August 16 since Goodstein's application was prepared by the plaintiff's patent solicitor. Within four months after that application was filed, Maynard was able to file his own application for the claimed mechanical improvements. The latch, the lock, the brace were contrivances of a character long known in the art.[8] We cannot believe that more than the skill of a craftsman familiar with the art was required to apply them in the way Maynard did to Goodstein's disclosure. The claims in suit of the Maynard patent are held invalid.

We entertain somewhat more doubt whether Goodstein's improvements on the B-5 machine involved "invention." That machine was made in accordance with Maynard's earlier patents No. 2,037,334[9] and No. 2,150,332.[10] It has the hinged coupling of the lever and the magazine to the base, and the lever carries a driver at its forward end. In operation it works in the same manner as does the machine based on Goodstein's patent. In each when pressure is applied to

a driver operative by the lever, resilient means carried by the lever and engageable with the magazine to yieldingly hold the lever raised with respect to the magazine, a pusher in the magazine, means for advancing the pusher, and interlocking means on the magazine and pusher for holding the latter retracted, said pusher being manually rocked to engage the interlocking means and automatically rocked by the resilient means on the lever to release the interlocking means."

7. "20. In a device of the type indicated, a magazine having a bottom wall with one end folded upwardly and side walls with their ends folded inwardly in spaced relation to the folded end of the bottom wall to form a throat therebetween, said magazine being adapted to hold a supply of fasteners extending thereacross and supported therein by the engagement of the ends of their legs with the bottom

wall of the magazine, an abutment at the end of the magazine opposite the throat, a strut extending between the abutment and the upwardly-folded end of the bottom wall to brace the latter against displacement rearwardly, and fastener-applying means movable relatively of the magazine for driving fasteners therefrom."

8. For a similar brace arrangement see Maynard patent No. 2,006,054 and Vogel patent No. 2,240,105.
 For a similar locking arrangement of the pusher see Maynard patent No. 1,-687,891 page 2 lines 91-109; Maynard patent No. 1,634,840 page 4 lines 68-81; and exhibit N made in accordance with Italian patent.

9. Filed Nov. 2, 1933 and granted April 14, 1936.

10. Filed May 24, 1937 and granted March 14, 1939.

the lever, the magazine moves· down with the lever until the magazine touches the paper to ·be stapled; the lever then continues to· descend causing the driver to sever the foremost staple from the stick, press it through the throat into the paper and clinch its legs against the anvil of the base. However, the loading mechanism of the B-5 machine is very different from Goodstein's. The stick ·of staples is pushed into· the front of the magazine against the resistance of the pusher-spring; the staples straddle a "core" of the magazine, as is probably necessary with this method of loading, and the magazine cannot be opened from the top by rotating the lever 180 degrees, as in Goodstein. His arrangement of loading the magazine from the top did away with the necessity of a "core," and provided a safe and easy method of loading and of clearing any staple which might become jammed in the throat. The absence of a core made it unlikely that staples would ·become jammed in the magazine. It was plainly an improvement over the B-5 machine but there still remains the question whether Goodstein's combination "amounts to a patentable invention or whether it might reasonably be expected of a mechanic or a person skilled in the art." Richmond Screw Anchor ʻCo. v. Umbach, 7 ·Cir., 173 F.2d 521, 524.

 The conception of loading the magazine through the open top was not a novel idea when Goodstein filed his application. It was disclosed in the earlier Italian patent to Parrott and the model, exhibit N, made in accordance therewith. That was a plunger-type device with a magazine having a retractable cover so that the staples could be loaded from the open top. In essence what Goodstein did was to· combine Parrott's retractable cover with the lever-driver ·of the B-5 machine. This court considered in Safety ·Car Heating ｜& Lighting Co. v. General Electric ʻCo., 2 Cir., 155 F.2d 937, 939 the criteria which may be helpful in determining whether a patentee's contribution to the art in combining old elements amounts to invention. Among them is the length of time the art, though needing the invention, went without it. Maynard's patent No. 2,037,334, on which the B-5 machine is based, was issued only a little more than two years before Goodstein's application was filed. Had the record shown a problem of long duration and a history of unsuccessful attempts to solve it, we might be persuaded that Goodstein's combination required skill amounting to invention. But his improvement came so shortly after Maynard's patent that, despite its commercial success, we are not convinced that more was required· than the skill of the craftsman and that the exacting standard of "invention" which the Supreme Court's decisions demand was satisfied. See Cuno Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58; Jungerson v. Ostby & Barton Co., 335 U.S. 560, 69 S.Ct. 269. Accordingly we think that the claims in suit of the Goodstein patent must also be held invalid.

Decree reversed and cȯmplaint dismissed.