**WILSON ATHLETIC GOODS MFG. CO., Inc., Plaintiff-Appellant,**

v.

**KENNEDY SPORTING GOODS MFG. CO., Inc. and J. Lawrence Kennedy, Defendants-Appellees.**

**No. 106, Docket 23671.**

United States Court of Appeals
Second Circuit.
Argued November 15, 1955.
Decided May 8, 1956.

Warren C. Horton, Chicago, Ill. (H. H. Hamilton, New York City, F. Thrall Brewer and Louis R. Simpson, Chicago, Ill., and Francisco Penberthy, Utica, N. Y.) for plaintiff-appellant.

David A. Woodcock, New York City (Watson, Leavenworth, Kelton & Taggart, New York City) for defendants-appellees.

Before FRANK, MEDINA and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

This is an appeal from a decision of Judge Brennan holding invalid claims 1, 2, 4 and 7 of U. S. Patent No. 2,231,204, which issued on February 11, 1941 on an application by Archibald J. Turner dated January 7, 1939. (Serial No. 249,696.) Judge Brennan's opinion is reported in 133 F.Supp. 469 and we shall assume, that readers of this opinion are familiar with its contents.

The patent states:

"My invention relates to baseball gloves and has for its object the provision of a finger construction in which the fingers in the normal position assumed by the glove (that is, in the position which the glove assumes in the absence of any outside distorting force such, for example, as the bending of the wearer's fingers) are either definitely curved toward ball grasping position or predisposed toward such curvature, and yet present an attractive and sightly appearance to the fingers."

It further recites various advantages resulting from the glove constructed as disclosed. Chief among these are the following:

"Also, even though the finger fronts are relatively flat and straight, the curvature of the backs and fingers, together with the general curvature of the stall and the normal curvature of the various fingers all combine to predispose the glove fingers, including the finger fronts, into the more curved position assumed in grasping and retaining the ball when caught."

and

"In its normal position my glove presents finger stalls which are especially well adapted to receiving the outer fingers in their normal somewhat curved position, so that the glove can be used without straining the fingers to flex the glove fingers into the position which the player wants them to assume when he is about to catch a ball. When the ball has impacted the palm and the fingers are closed upon it, the curvature of the finger stalls predisposes the glove fingers to a facile flexing to increase the curvature to ball retaining position so that, in all, a minimum of finger effort is required of the player."

The patent teaches with meticulous detail just how gloves with the inwardly curving fingers can be constructed. The dominant feature, on which appellant places particular stress for a disclosure of novelty and invention, is the presence in the combination of a longitudinal seam, along the middle of the finger backs, which joins together the two convexly shaped edges of the two pieces of leather of which the back of each finger stall is comprised. As a result of this feature the upper portions of the finger stalls conform to the stated objective: they are curved inwardly toward a ball grasping position in conformity with the shape of the hand in a relaxed condition. And the claims in suit each cover a glove constructed as taught in the specification, except Claim 7 which is confined to a "baseball glove *finger.*"

Such being the patentee's disclosure of his alleged invention, the crucial question posed is whether inventive faculties were required to discover that the means disclosed would provide in a baseball glove "a finger construction in which the fingers in the normal position assumed by the glove * * * are * * * definitely curved toward ball grasping

position or predisposed toward such curvature."

As to this, the O'Hara patent, No. 2,-109,974, which issued on March 1, 1938 on an application dated June 22, 1935, and which related "generally to gloves or the like and more particularly to a baseball mitt," had as its general object a "mitt constructed so that its normal tendency is to form the desired pocket or cup to receive a ball." And the means disclosed was to make the back of each finger stall of two pieces which were seamed together transversely of the finger stall. These two pieces were shaped so that their opposing edges were convexly curved, the result being that, when seamed together, by reason of the extra material provided by the convex edges, the upper position of the finger stalls were bent inwardly so that the front of the glove predisposed to a pocket shape.

Clearly O'Hara preceded Turner in recognizing the desirability of a glove shaped to form a pocket. Like Turner, he achieved his objective through the use, in the construction of the back of the finger stalls, of two pieces the opposing edges of which were convexly curved. The only difference of possible significance lay in the fact that O'Hara's seam ran transversely of the finger back whereas Turner's ran longitudinally. It is true that the Patent Office had cited O'Hara as a prior art reference and notwithstanding found Turner's construction patentable. But even applying, as we must, the test of 35 U.S.C.A. § 103, Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530, we simply cannot agree that in the light of O'Hara's disclosure of finger-stall curvature obtained by transversely seaming convex edges, it was not "obvious * * * to a person having ordinary skill in the art" of baseball glove manufacture that desired curvature might be obtained by seaming convex edges longitudinally. Especially is this so in view of the fact that straight finger stalls formed by a median longitudinal seam of the back pieces was well known in the straight fingered

gloves of the prior art, as witness the B. Kennedy Patent No. 1,345,478, of 1922. Indeed, the appellant itself concedes that median seams in the backs of all sorts of gloves were old in the glove-making art.

Furthermore, the claimed invention lies generally in the art of leather sporting goods, such as punching bags, footballs and baseballs. All these items, which the appellant concedes are as old as baseball itself, have curved surfaces made by stitching or seaming together opposed edges convexly shaped. They demonstrate, we think, that it must have been obvious to one of ordinary skill in the manufacture of leather sporting goods, that the desired curvature of the finger backs of baseball gloves could be obtained by the same means.

Without further excursion into the prior art we are satisfied that the claims in suit are lacking in patentable invention. However, our conclusion is further supported by a finding below that as early as 1930 the Ken-Well Company had designed and sold to the trade a glove with inwardly curving finger stalls which constituted a prior use anticipating Turner's invention. This glove was sold under the trade name of the "Dazzy Vance Model 560." The appellant contends that this was a straight-fingered glove and in support of that contention offered, in addition to a purely conclusionary piece of testimony, a much used and badly mutilated specimen of the model. However, we think the weight of evidence fully supports the Judge's finding that the "Dazzy Vance" model constituted an anticipation of Turner's disclosure. Its illustration in the Ken-Well catalogue of 1930 shows the longitudinal median seams in the back of the finger stalls, at least upward from the finger crotch, and appears to depict an inward curve to the finger stalls such as is exemplified in the Turner patent and the appellant's product. That such, indeed, was the shape of the glove was supported by testimony of former employees of the Ken-Well Company. Our examination and manipulation of the battered

model in evidence confirms that view. Even in this model the median seams in the back of the finger stalls appears adapted to provide an inward curvature from the finger tips down to the second joints. We strongly suspect that if the median seam were opened, it would appear that two convex edges had been welted together. Certainly we cannot say that the finding as to this prior use was clearly erroneous.

It may also be observed that the Ken-Well catalogue of 1930, in describing the Dazzy Vance model, said: "The curve or 'scoop' that is built into each glove, forming a natural pocket, insures the player of being able to pick up the grounders." Also: "the lace [which joins thumb and the next three fingers] closes glove at touch of ball." This disclosure tends to show that, quite apart from the detail of construction, Ken-Well anticipated Turner in originating the idea of a "broken-in" glove,—that is, one ready-made with inwardly curving flexible fingers to facilitate "the natural formation of a ball receiving pocket and to provide an almost automatic bending of the fingers and palm around a ball striking the glove." (Quoting from appellant's brief.)

The appellant contends that error is disclosed in the following passage in Judge Brennan's opinion [133 F.Supp. 472]:

"It appears without doubt that the Ohio-Kentucky Company, a competitor, produced a curved finger glove in 1938 which was sold for 1939 trade. The dates of this activity are not definitely fixed so that the Court is hesitant to find same as a prior use, but it may be given weight as showing an advancement in the skill of the art since it was produced without collaboration with the Turner inventor at about the time the Turner patent was applied for. Ruben Condenser Co. v. Aerovox Corp., 2 Cir., 77 F.2d 266, at page 268."

In this observation we find no error. The judge did *not* treat the Ohio-Kentucky glove as a prior use which would constitute a statutory bar under 35 U.S.C.A. § 102(a) or (b). Concededly his findings could not support such a holding. We think he meant only that the item was of "some weight" on the issue of patentable invention. As to this, it is of course often possible that a genuine invention may be made by two or more inventors at about the same time by wholly independent effort: that the work of one "come[s] to fruition soon after a patentee's" does not necessarily mean that the accomplishment was attainable without draft on truly inventive faculties. But as we held in the case which Judge Brennan aptly cited, it is a fact which somewhat tends to show that the accomplishment was one within the range of those skilled in the art. Cf. Concrete Appliances Co. v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222.

Lastly, the appellant contends that patentable invention in the Turner disclosure is demonstrated by the commercial success of its patented product. It points particularly to the widespread acceptance of its product by professional ball players in preference to the now obsolete "Dazzy Vance" model. These are indeed factors which show that the commercial product is an improvement over the prior art glove including the "Dazzy Vance" model. But we find nothing in the evidence that persuades us that the improvement is attributable to the detail of design and construction disclosed by Turner. A comparison of the appellant's commercial specimen with the Dazzy Vance glove in evidence, shows that the former is somewhat longer from finger tip to wrist, and with thumb and fingers extended considerably wider. The Dazzy Vance fingers are shorter,—so short in fact that their crotches, instead of fitting into the finger-crotch of the wearer, come at about the level of the second joint. And the width of the Dazzy Vance fingers as measured from seam to seam across the front is less, with the result that the interstices between the fingers are greater. The appellant's commercial specimen appears

284

to permit of a greater spread between the thumb and first finger with the intersticial space filled with a web which seems an obvious improvement over that used in Dazzy Vance. And for aught that appears the overall efficiency of the commercial specimen may be due in part to improvements in the material, the padding and the lacing between the finger tips. All the foregoing differences are factors not included in Turner's disclosure. Thus the evidence of wide acceptance of the commercial product demonstrates at most that it is an overall improvement,—not that Turner's contribution constituted patentable invention. Certainly, this is not a case in which evidence of commercial success tips the balance on the issue of invention. Jungerson v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S. Ct. 127, 95 L.Ed. 162. Cf. Kromer v. Riegel Textile Corporation, 7 Cir., 227 F.2d 741.

Affirmed.