52 CCPA

**Application of Grover C. CABLE.**
**Patent Appeal No. 7333.**

United States Court of Customs
and Patent Appeals.
July 1, 1965.

Elliott I. Pollock, Washington, D. C.,
Reed C. Lawlor, Los Angeles, Cal., for
appellant.

Clarence W. Moore, Washington, D. C.
(Raymond E. Martin, Washington, D. C.,
of counsel), for the Commissioner of
Patents.

Before WORLEY, Chief Judge, and
RICH, MARTIN, SMITH, and AL-
MOND, Judges.

SMITH, Judge.

Appellant invented an improved metal
trim having particular utility in dry-wall
type construction, and on February 23,
1960 filed an application serial No. 10,508
for patent thereon. The claims were re-
jected by the examiner, and this rejection
was affirmed by the Board of Appeals.

The rejection is for obviousness of the
claimed invention (35 U.S.C. § 103) in
view of the following references:

| | | | |
|---|---|---|---|
| Clark | 1,308,773 | July 8, | 1919 |
| Clark | 1,308,889 | July 8, | 1919 |
| McChesney | 1,804,564 | May 12, | 1931 |

As an "improved" metal trim, the
claimed embodiment may appropriately
be considered in light of the statement
in Robinson on Patents § 210:

> An improvement is an addition to
> or alteration in some existing means,
> which increases its efficiency with-
> out destroying its identity. It in-
> cludes two necessary ideas: first,
> the idea of a complete and practical-
> ly operative art or instrument, ei-
> ther natural or artificial, as the orig-
> inal to be improved; and second, the
> idea of some change in such art or
> instrument, not affecting its essen-
> tial character, but enabling it to
> produce its appropriate results in a
> more perfect or a more economical
> manner. * * *

There is an initial problem here con-
cerning the claims essential to a deter-

mination of the issue on appeal. At oral argument, counsel for appellant indicated that more claims were present than would otherwise be necessary, apparently, we assume, because of concern as to whether claims in combination form would be more acceptable to the examiner than claims to a trim member per se. Thus claims 1–10 and 16–18 are directed to a combination which includes the trim member as an element while claims 11–15 and claim 19 are directed to the trim member per se.

The board considered claim 1 as illustrative, and as to the combination claims, we shall do likewise. This claim is as follows:

1. In combination with a structural member of a building and a substantially flat piece of wallboard overlying said structural member:

an elongated unitary trim member substantially rigid, both transversely and longitudinally and comprising a pair of straight substantially planar trim sections and having an elongated convex bead joining said trim sections along a common junction edge extending lengthwise of said trim member, said trim sections being inclined to each other, said trim member being disposed over an edge of said piece of wallboard, one of said trim sections being disposed upon the outer face of said piece of wallboard and the other of said trim sections extending in a direction to cover and protect said edge of said piece of wallboard whereby said bead forms a rigid corner and provides a reentrant portion along one trim section, said trim member and wallboard further defining a cavity adjacent the interior of said trim member and between said structural member and said edge of said wallboard;

a plurality of fasteners extending through said one trim section and thence through said piece of wallboard into said structural member;

said one trim section having at least two substantially parallel rows of openings formed therein between said bead and the edge of said one trim section remote from said bead, the openings in at least one of said rows being in the form of elongated slots that extend lengthwise of said trim member and overlie said wallboard, the openings in the other of said rows including openings having a lesser open area than that of any of said elongated slots and disposed to overlie said cavity;

and a body of filler material adjacent said one trim section and filling the reentrant portion thereof, the outer surface of said filler material being flush with the outer edge of said elongated bead, said body of filler material covering the edge of said one trim section remote from said bead, whereby the edge of said one trim section and the adjacent portion of said wallboard are concealed, portions of said body of filler material extending in different amounts through said differently sized openings and being locked therein.

In order to facilitate consideration of the claims to the trim member per se, we shall also consider claim 11 as illustrative. It reads as follows:

11. An elongated unitary trim member which is substantially rigid both longitudinally and transversely, said trim member having a pair of straight substantially planar trim sections and having an elongated convex bead joining said trim sections along a common junction edge extending lengthwise of said trim member, said trim sections being arranged at an angle to each other for disposition around a corner of a building structure, whereby said bead will form a rigid corner at the corner of such building structure, said bead providing reentrant portions along said trim sections, each of said trim sections having at least two substantially parallel rows of elongated slots extending lengthwise of said trim section, the projections

of said slots on each trim section onto a base line, which extends the length of said trim member occupying subtantially all of said base line without substantial overlapping, said rows of slots being laterally spaced on each trim section, and the slots of each row being longitudinally spaced along the trim section, whereby to retain substantial rigidity of the trim member both longitudinally and transversely, said slots being adapted to serve as bonding openings to receive filler material applied in said reentrant portions to lock such filler material in place.

As an improved trim member, the invention is relatively simple and uncomplicated. It becomes one element of the claimed combination when it is attached to wallboard members. If, however, we ask ourselves what appellant invented, the answer from the specification itself is that he invented an improved trim member. Any new result attributed to the claimed new combination necessarily flows from and is inherent in the improved trim strip per se.

Applicant's specific trim strip is characterized by at least one trim section having a novel array of elongated slot-like bonding apertures formed therein. These apertures are of particular shape, size, proportion and arrangement which features, appellant asserts, obviate cracking, fracture and various other problems which had previously plagued dry-wall constructions using other types of trim members.

The trim member itself comprises a metallic trim unit characterized by at least two substantially parallel rows of differently dimensioned openings, with the openings in at least one of said parallel rows being of slot-like configuration and of a length and width different from the openings in the other of said parallel rows. The differently dimensioned openings in the rows are disposed in staggered substantially non-overlapping relation to one another. The resultant trim strip has the rigidity required in dry-wall constructions. Applicant's slot array is such that projections of the slots in both rows onto a base line extending the length of the trim member occupy substantially all of said line and thus it permits the formation of an effectively continuous line of joint cement bond with the underlying panels of the dry-wall construction. Appellant asserts that the trim member permits the establishment of a far better bond than was possible in the prior art, and further that he achieves these results without detracting from the strength or rigidity of the trim member necessary to a satisfactory dry-wall installation. As defined in the appealed claims, the differently dimensioned elongated slots are also positionally related relative to the corner bead of the trim member and to certain underlying surfaces and cavities formed by the assembly of wallboard panels.

■ Patentability of appellant's invention under 35 U.S.C. § 103 must be evaluated against the background of the highly developed and specific art to which it relates, and this background includes an understanding of those unsolved problems persisting in the art which appellant asserts to have been solved by his invention. See Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923).

These problems arise in so-called "dry-wall" constructions, which are used in building construction and which are built up from pre-formed panels of gypsum rock, or the like, having cardboard or similar sheets secured to the outer surfaces thereof. When such panels are secured to the framing structure of the wall and positioned to form a corner, the corner must be protected and the joint between the panels must be filled with a joint cement. In the dry-wall art, prior to applicant's invention, such a finished structure was produced by first nailing an elongated metal trim strip of substantially L-shaped section to the meeting wallboard panels, using nails normally spaced some eight inches apart. "Joint cement" or filler material was applied over the heads of the nails and formed to have its outer surface lie in

a plane flush with the rounded corner bead of the trim strip. The joint cement was tapered or flattened from the bead to blend smoothly into the surface of the wallboard adjacent the edge of the trim strip. The joint cement normally employed in dry-wall constructions is a relatively low strength material which is primarily used to conceal the corner strip and nail heads.

The novel aspects of appellant's trim strip and its combination in a dry-wall construction are set forth with varying degrees of specificity in the appealed claims. Claim 11, supra, directed to the trim strip itself, calls for a trim member comprising a pair of straight "substantially planar trim sections" joined by an elongated bead; specifies that each of the trim sections have "at least two substantially parallel rows of elongated slots extending length-wise of said trim section"; further states that the slots are so arranged that "projections of said slots on each trim section onto a base line, which extends the length of said trim member [occupy] substantially all of said base line without substantial overlapping"; and further states that the trim member has "substantial rigidity * * * both longitudinally and transversely". The claims dependent upon claim 11 bring out further dimensional relationships between applicant's differently dimensioned slots (claim 12); the positional relationships of such differently dimensioned slots with respect to the bead (claim 13); the positional relationship of certain nail holes to the slots (claim 14); the relationship of the area of the slots to the area of the nail holes (claim 15); and the filler capacity and positioning of certain relatively narrower and wider slots, relative to one another (claim 19).

The combination claims, 1–10 and 16–18, contain similar limitations as to the structure of the trim strip and further define the positioning of the slots relative to the wallboard members and to cavities formed upon assembly of such wallboard members. For example, claim 1 calls for at least two substantially parallel rows of openings, with certain openings of "lesser open area" overlying a cavity defined adjacent the junction of the wallboard panels; and with larger area openings "in the form of elongated slots" overlying the wallboard itself, rather than said cavity. Similar limitations are found in the other combination claims: thus, claim 2 recites that both rows have elongated slots with the slots overlying the wallboard members "being narrower" than the slots overlying the wallboard cavity. Claim 3 calls for "at least two substantially parallel rows of differently dimensioned elongated slots" and recites the positioning of these "differently dimensioned elongated" slots relative to one another and to various portions of the over-all wallboard assembly. Even more specific recitations of the structure may be found in certain of the dependent claims: thus, claim 6 relates the length of the elongated slots to the width of the trim section; claim 7 relates the width of the elongated slots to the width of the trim section; claim 8 relates both the lengths and widths of the various slots to the width of the trim section; claim 9 recites the provision of an auxiliary row of bonding holes located between the rows of slots and the corner bead, and the positioning of said auxiliary holes relative to the elongated slots; and claim 10 defines the width and length dimensions of the slots in one row in relation to the length and width dimensions of the slots in a different row.

The remaining claims, not specifically discussed above, have similar such limitations and it is appellant's position that the structure thus recited is different from anything shown in either McChesney or the Clark patents, or in any logical combination of those references. He further asserts that what he has done represents an unobvious departure from the teachings of the references. The structural differences between the trim member claimed by appellant and the

trim members of the prior art and the many attendant practical advantages have been established in the record by affidavits of persons skilled in the art of dry-wall construction, and appellant urges these as evidence of the unobviousness of the present invention.

We think the examiner and the board have misapprehended the purpose for which it seems to us the affidavits were furnished. Thus, the examiner stated:

> * * * the use of elongated slots or holes being old in corner trim, the fact that applicant has enjoyed commercial success through the use of such slots is immaterial insofar as the question of patentability is concerned; and the evidence which applicant has adduced bears only on the use of the slots per se and not the arrangement thereof.

The board considered the affidavits as "giving testimony to public acceptance and sale." While we agree that the affidavits do include such "testimony," they also, it seems to us, establish the existence of unsolved problems in this highly developed art and appellant's solution of them.

■ While we agree fully with the examiner that proofs of commercial success are relevant to resolve rather than create doubts as to patentability, we disagree with his action in ignoring what these affidavits show as to the factual background of the art. Since the major premise in the examiner's position is that the use of elongated slots or holes are "old" in corner trim, we turn to the cited prior art and find that while the general statement is true, it leads to a conclusion based on a faulty assumption, for appellant is not claiming "elongated slots or holes" per se. Instead, as above pointed out, the claims are carefully drawn to define not "holes" but elongated slots *having particular sizes and relationships with each other*. These sizes and relationships are closely related to the overall requirements of a trim strip suitable for dry-wall construction and were de-

veloped as the means by which to solve a persistent problem in this art.

Turning now to a more detailed consideration of the cited art, we think the examiner's answer states the strongest case which can be made for the disclosures of the art of record:

> The patent to McChesney discloses a corner construction wherein a pair of wallboards 2 and 3 are placed in overlying relation to a structural member 1, with a trim member, having planar sections 4 and 5 joined by a convex bead 6, covering the edges of the wallboards. The trim member, wallboards and structural member are joined by means of nails 7 and 8 passing through holes $4^x$ and $5^x$ in the trim member and thence through the wallboards into the structural member 1. A covering of filler material $2°$ and $3°$ is then applied and forced through both holes 9 and 10 and those holes $4^x$ and $5^x$ which are not occupied by nails; thus keying the filler material in place when it hardens.

> Both of the Clark patents are also directed to corner beads or trim members. Several modifications are shown, but basically all of the trim members comprise a pair of sections connection [sic] by a convex bead with a plurality of elongated slots or holes formed in each section. The slots and holes are not formed by slitting and expanding the metal as stated in appellant's brief but rather by "slitting the metal and turning the edges of the slits so as to constitute reenforcing flanges instead of by punching and removing portions of the sides as has been customary." * * * The ribs, 16 and 17 in Figure 1 for example, are then formed by bending. The several modifications result chiefly from the use of differently shaped ribs and from different arrangements of the slots; the latter appearing in either aligned *of* [sic] staggered relation-

ship. Note Figures 1 and 4 for example.

As summarized by the board:

* * * the Examiner finds in McChesney the basic organization for a corner bead usable in dry wall construction. Attention is directed to openings 9 and 10 capable of use over cavities in the underlying wallboard joint, and to the presence of openings $4^x$ and $5^x$ in the arms 4 and 5 which serve as nail holes and as holes through which the filler can key to form a bond. Attention is directed to the Clark patents for indication of stock thickness and opening formations in connection with prior art devices. * * *

Appellant challenges this use of the prior art and points out in his brief:

The primary reference relied upon below is McChesney (R. 95). This reference, far from anticipating applicant's invention, typifies the very structure which applicant was seeking to avoid (See applicant's discussion at R. 5). McChesney utilizes a plurality of round holes spaced apart by distances substantially greater than their diameters, a structure which results in "serious fracture of the joint cement" as noted by applicant (R. 5). See also Horpel's testimony at R. 29–30, and 32; Cable's testimony at R. 49; and the exhibits appended to Cable's affidavit.

The secondary references to Clark (R. 87–94) in no way obviate the structural and functional deficiencies of McChesney. Clark does not even mention cracking or fracture problems of dry-wall assemblies, since Clark is concerned with a "wet-wall" structure which does not have the problem due to the greater structural strength of plaster (R. 31). Clark shows a corner bead construction intended for installation in a wet wall, and used as a skeleton or shaping device adapted to receive plaster. The record shows that such a structure is not satisfactory for use in dry-wall construction (R. 31).

Clark's structure is of the so-called "expanded metal" type. After slits are formed, the metal is stretched laterally thereby to deform and off-set the narrow intervening strips so as to cause these strips to upstand from the original metal plane and produce a third dimension in the structure. This third dimension is clearly evident in each of the Clark patents, i. g., see the several cross-sections at R. 87, and see also Figure 2 at R. 91. Such a three-dimensional device clearly differs from the "planar trim sections" specified in each of the claims on appeal. Moreover, the existence of this three-dimensional configuration makes the Clark structures totally useless for dry-wall constructions since (a) Clark's trim strip would be far too flimsy to provide proper structural support for the relatively weak joint cement; since (b) so much joint cement would be required to cover and conceal the three-dimensional trim as to render the installation uneconomical (joint cement being very much more expensive than plaster); since (c) the joint cement, even if applied to such a three-dimensional corner structure, would have to be feathered out far beyond the trim strip to merge the cement smoothly into the adjacent wallboard; and since (d) so much joint cement would have to be provided as to result in severe cracking of the joint cement.

Nor could any of the foregoing problems be avoided, in Clark, by restoring the upstanding third dimensional strips to flattened positions. Indeed, if any such restoration were attempted, Clark's apertures would reclose; or, in the alternative, the upstanding strips would have to be even further deformed, something never shown or even suggested by Clark.

The basic reference of record thus does not even suggest the problem or solution recognized by applicant; and the pair of even older secondary references are directed to structures intended for use in an entirely different field, and also fail to suggest the problem or solution contemplated by applicant.

We have examined the portions of record referred to in the above quoted portion of appellant's brief and have carefully weighed the matters referred to therein against the positions of the examiner and the board. We think there is substantial evidence, from the history of this art as reconstructed from the specification herein and the affidavits of record, that the examiner and the board were in error in holding the claimed invention as a whole to be obvious at the time it was made.

■ Where affirmative evidence is of record bearing on the history of an art, it should be considered and given appropriate weight in arriving at an "objective" vis-a-vis a "subjective" determination of the issues arising under 35 U.S.C. § 103. As stated in Allen v. Standard Crankshaft & Hydraulic Co., 323 F.2d 29, 24 (4th Cir. 1963):

> In approaching the question of obviousness, however, judges [and, we would add, examiners] should mistrust their subjective notions if there are objective indicia to guide their judgments. Though the answer after the event may appear simple, the Court should not convert its simplicity into obviousness in the face of hard proof of recognized need for the answer, of long, unsuccessful search for the answer by people of skill in the art, of recognition by the industry that the claimed invention was the answer, and of its prompt adoption with attendant commercial success. Even a substantial combination of some of such criteria ought to outweigh a judge's subjective convictions that if one as skilled as he had really looked for the answer, he immediately could have put his finger upon it.

There is ample evidence of record in this case to permit such an objective determination of obviousness under 35 U.S.C. § 103. The record shows:

1. Corner members for dry-wall constructions of the prior art McChesney type (characterized by round holes) have been available for more than thirty years. Such round hole structures, when employed in dry-wall constructions, result in severe fracture, cracking, and separation of filler material normally employed to finish corners in such dry-wall constructions.

2. There is no showing in the art of record that there was *any* solution to this problem of severe fracture, cracking and separation of fill material normally employed in the dry-wall art during the thirty-plus years following issuance of the McChesney patent, much less even a suggestion that the problem could be solved by somehow combining the relatively rigid McChesney round-hole type dry-wall corner strips with all or a portion of the relatively flimsy expanded metal Clark wet-wall type corner strips. The suggestion for so doing is first found, in this record, in appellant's specification.

3. The evidence of record establishes that appellant's improvement, while simple when viewed after the fact, solved the fracture and cracking problem and, in addition to solving this problem, appellant's novel trim member also, and we think unexpectedly, permitted a spectacular decrease (some eight-fold) in the number of nails required to mount the trim member on the wall. And it did so without weakening the rigidity of the construction. Other advantages to which the evidence of record refers are the attendant decrease in the time required for strip installation; ease in cutting of the strips to length; easier application of the joint cement; and better retention of the joint cement.

4. Appellant's improvement, although embodied in a somewhat more expensive

structure than was available prior to his invention, gained acceptance in a highly competitive field to the extent that some contractors have insisted upon his slotted constructions to the virtual exclusion of the round hole prior art type devices.

5. There is positive evidence in the record in the affidavit of Horpel, a man who had worked in the field since 1934, that:

> Even though applicant's [sic: affiant's] principal business activities since 1934 have involved dry-wall construction, he has been familiar with wet-wall construction during that period and has been familiar with the fact that expanded metal lath of various kinds such as that disclosed by Schepis [here Clark] has been employed to provide a base or skeleton for the formation of a corner of a plaster wall. Even though affiant employed hundreds of thousands of feet of corner bead and casing employing round holes in 1954, 1955 and 1956, it was not obvious to him that it would be advantageous to use slotted holes instead. In affiant's opinion, it would not be obvious to replace the round holes of the McChesney structure with the elongated holes of the Schepis [Clark] structure since the McChesney structure was intended for use in dry-wall construction and the Schepis [Clark] structure and similar expanded metal lath structures which have been known since 1934 were only intended for use in wet-wall construction.

6. We have been unable to find in any reference of record a recognition of the fracture and cracking problem solved by applicant, or a solution therefor, or a suggestion of the many additional new results flowing from appellant's invention. The facts should, we think, have convinced the Board that the references did not make obvious to one of ordinary skill in this art the structure here claim-ed. As stated in In re Shaffer, 229 F.2d 476, 43 CCPA 758:

> * * * . a person having the references before him who was not cognizant of appellant's disclosure would not be informed that the problems solved by appellant ever existed. Therefore, can it be said that these references which never recognized appellant's problem would have suggested its solution? We think not, and therefore feel that the references were improperly combined since there is no suggestion in either of the references that they can be combined to produce appellant's result.

The board stated that applicant's improvement was not "productive of such unexpected results" as to warrant the grant of a patent. Insofar as this ruling was intended to be a finding of fact, the board's conclusion is unsupported by, and directly contrary to, the evidence of record. The elimination of the cracking and fracture problems inherent in prior dry-wall constructions seems to us to be an unexpected result, particularly when that result is achieved by a trim member structure which as shown by the evidence of record has markedly reduced nailing and installation time requirements, easier severability to desired lengths, and easier application and better retention of the joint cement.

Pertinent to the considerations here in issue are the observations of Mr. Justice Jackson in his dissenting opinion in Jungersen v. Ostby & Barton Co., 335 U.S. 560, 571, 69 S.Ct. 269, 93 L.Ed. 235 (1949):

> Of course, commercial success will not fill any void in an invalid patent. But it may fill the void in our understanding of what the invention has meant to those whose livelihood, unlike our own, depends upon their knowledge of the art. Concededly, in this high-pressure age sales volume may reflect only powerful promotion or marketing magic, and its significance as an index of novelty

or utility may rightly be suspected. But Jungersen's success was grounded not in the gullibility of the public but in the hard-headed judgment of a highly competitive and critical if not hostile industry. Knowing well its need for and its failure to achieve improvements on available processes, that industry discarded them, adopted this outsider's invention, and made it a commercial success.

It would take a singular self-assurance on the part of one who knows as little of this art as I do, or as I can learn in the few hours that can be given to consideration of this case, to ignore the judgment of these competitors who grew up in the industry and say that they did not know something new and useful when they saw it. And if Benvenuto Cellini's age-old writings are so revealing to us laymen of the appellate Bench, it is hard to see why this practical-minded industry which the Court says was following Cellini failed through all the years to get his message.

This case presents a c'ose question under section 103 and one which has been very difficult of resolution. As stated by Judge Learned Hand in Reiner v. I. Leon Co., 285 F.2d 501, (2d Cir. 1960):

The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person "having ordinary skill" in an "art" with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, "obvious" is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant? In the case at bar the answers to these questions all favor the conclusion that it demanded more intuition than was possessed by the "ordinary" workers in the field. * * *

The invention here in issue is like that characterized by the same judge in Dewey & Almy Chem. Co. v. Mimex Co., 124 F.2d 986, (2d Cir. 1942) in that:

* * * It would indeed be absurd to rank the invention as a great pioneer such as come only at rare intervals and are the work of genius. Indeed, it is precisely those which probably need no patents to call them forth; the stimulus of profit has little or no part in their production. The patent law is aimed at animating a lower order of imagination and skill than that; more, it is true, than the ordinary rub of competition automatically brings out from competent workmen in the art, but not the superlative skills—at least that has been its uniform avowed purpose. Perhaps the system is outworn, but while it stands, it stands clothed with its history like any other statute, and it seems to us that not to recognize so substantial an achievement as this which has resulted in the improved preservation of foods and other perishable goods, would deny recognition where recognition most is helpful. These inventors did not move along a well-marked way; they struck out a new path which led to a goal that men had unsuccessfully tried to reach for many years. To say that for this they needed to look no further afield than the ordinary routineer, one must shut one's eyes to all the significant facts.

█ It is only in retrospect that the invention here c'aimed can be said to be "obvious" and hence unpatentab'e. As against such a temptingly simple analysis we have a record containing evidence

of the fact that though metal trim sections were known in both the "dry wall" and "wet" plaster wall types of construction, there remained problems with fracture and cracking which were not eliminated until appellant's invention. We think that where such objective evidence is available it should be used in resolving the issue of patentability under section 103. Judge Medina has stated our views in his dissenting opinion in Lorenz v. F. W. Woolworth Co., 305 F.2d 102, (2d Cir. 1962):

> To say now in retrospect that the patented combination was "obvious" is totally to ignore the evidence that though the means were well known, none of the many who worked for years to obtain the result achieved by Schliephacke thought of making this allegedly "obvious" combination. The issue of obviousness should be decided by the use of this type of objective evidence as a yardstick. Otherwise, we are pretending to decide what was or was not obvious to the worker in the field in question, but really making a guess, a mere stab in the dark, on the basis of our own very limited, personal experience, what Judge Learned Hand calls our "ignorance." And we make this guess only after the secret that lies at the base of the alleged invention has been explained to us. * *

In view of the foregoing, the decision of the board is reversed.

Reversed.

WORLEY, C. J., concurs in the result.

MARTIN, Judge (concurring).

I agree with the result here primarily because of the strong showing appellant has presented in affidavits. An affidavit of one Horpel, who is a licensed dry-wall contractor having a BS degree in "industrial engineering," states inter alia (the trims labeled 101, 202, 303 being the type claimed):

> Affiant also employs metal trims, such as casings identified by numbers 101, 202, 303 shown in Exhibit A. While similar casings are on the market that employ large round holes, affiant has found it best to use trim members with the slotted holes because of the additional bonding strength obtained by the use of such holes.
>
> Affiant has constructed many houses which have employed trims of the type identified as insert No. 101 and of the type identified as L edge No. 202 of Exhibit A. Affiant has also constructed many houses which have employed trims of the same shape but with large round holes. Such trim has been used, for example, around doorways. In a group of about 300 houses in which affiant employed trims like insert No. 101 and L edge No. 202, *but employing round holes,* affiant found that within about two months of the completion of houses employing such trim on the average, cracks and separation developed over an area of about one foot on the latch side of the doorway, but on the opposite side of the door jamb from which the door opens. In a group of about 200 houses in which affiant used only slotted trim of the type represented by insert No. 101 and L edge No. 202, no such cracks or separation occurred. In fact, affiant never had any such cracks or separation appear when slotted casing has been used. In both instances referred to, approximately one hundred thousand feet of door trim was employed. Approximately 35 feet of trim is used around the average door. In other words, approximately 3,000 doors were installed with round hole trim, and approximately 3,000 with slotted trim. The houses averaged about twelve doors each. [Emphasis mine.]

I think that showing, in this crowded art, is sufficient to resolve the doubt I have in favor of appellant. Thus I think the reversal of the rejection on the prior art to be correct.