**CALGON, INC., Plaintiff,**

**v.**

**MORTON SALT COMPANY, Defendant.**

**Civ. A. No. 4955.**

United States District Court
M. D. Pennsylvania.
Sept. 29, 1959.

Blenko, Hoopes, Leonard & Buell, Pittsburgh, Pa., Reed, Smith, Shaw & McClay, Harrisburg, Pa., for plaintiff.

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., McNees, Wallace & Nurick, Harrisburg, Pa., for defendant.

FOLLMER, District Judge.

Plaintiff, Calgon, Inc., a Pennsylvania corporation (hereafter referred to as "Calgon"), brings this action against the

defendant, Morton Salt Company, an Illinois corporation (hereafter referred to as "Morton"), seeking a declaratory judgment against Morton with a determination of non-infringement of a patent owned by Morton in the use of certain unpatented chemicals supplied to its customers by Calgon and used by them in accordance with practices recommended by Calgon, and likewise that said patent be declared invalid. The defendant, Morton, by counterclaim conversely seeks a determination of validity of said patent, as well as a finding of infringement by Calgon through its activities and the practices recommended to its customers in connection with the sale of such chemicals.

Calgon is engaged in the sale of chemicals, including two phosphate chemicals for use in brine manufacture. The chemicals involved are sold under the trade names "Calsofix" and "Keylex." Calsofix, chemically, is sodium hexametaphosphate. It has also been sold under the trade name of "Calgon." Keylex, chemically, is a sodium-calcium hexametaphosphate. The difference between them is that Calsofix is readily soluble in water whereas Keylex is slowly soluble.

Morton is engaged in what may be broadly termed the manufacture of salt, is the owner of salt mines, and is the owner of the patent involved in this action.

The original applicant for the patent was Rock L. Comstock who, during the pendency of the application, made an assignment to the Bay Chemical Company, Inc., by which he was employed. The application was filed January 25, 1944, and the patent in suit [1] for "Preparation of Purified Brine" and numbered 2,433,601, issued December 30, 1947. Bay Chemical Company, Inc., operated a salt mine in the State of Louisiana, and was the owner of this patent when Morton acquired the Bay Chemical Company and the patent has remained the property of Morton throughout this action.

Comstock states that his "invention relates to the preparation of purified brine and more particularly to the preparation of sodium chloride brine low in calcium and sulfate radicals from crude sodium chloride or rock salt containing substantial quantities of calcium sulfate."

The original application was filed on January 25, 1944, and was rejected on October 26, 1944.[2] On August 19, 1946, after an amendment, there was what was termed a "final rejection" [3] of the twenty claims then filed. An amendment [4] was filed on February 3, 1947, which was in effect a rewritten application which included the ten claims ultimately allowed. The patent was finally granted December 30, 1947. The basic claims 1, 5, and 6 may be stated by setting forth claim 1 and noting the variations in claims 5 and 6 as follows:

(1) In a method of preparing brine in which the materials brought into contact to form said brine are water and a solid water soluble salt (claims 5 and 6 substitute "solid sodium chloride" for "a solid water-soluble salt") containing a substantial amount of water-soluble calcium sulfate as an impurity, the improvement which comprises forming a brine low in sulfate radical and calcium radical by adding to one of said materials before bringing said materials into contact a small amount (claim 6 substitutes "an amount between approximately 0.051 and 0.25% by weight based on the sodium chloride dissolved in said water" for "a small amount") of water soluble alkali metal compound (claim 6 substitutes "salt" for "compound") selected from the group consisting of alkali metal carbonate and alkali metal phosphate and which reacts with calcium sulfate in aqueous solution to precipitate a water-insoluble calcium compound,

1. Calgon Exhibit 1 and Defendant's Exhibit 2.

2. Calgon Exhibit 2, Page 16.

3. Calgon Exhibit 2, Page 33.

4. Calgon Exhibit 2, Page 35.

thereafter bringing said materials into contact to dissolve salt (claims 5 and 6 substitute "sodium chloride" for "salt") in said water and separating residual solid material from the resulting brine.

Claim 2 is:

"The method defined in claim 1, in which the amount of water-soluble alkali metal compound added to one of said materials is between approximately 0.051 and 0.25% by weight based on the salt dissolved in said water."

Claim 3 is:

"The method defined in claim 1, in which the amount of water-soluble alkali metal compound added to one of said materials is between approximately 0.0014 and 0.0057 pound per gallon of water used to dissolve said salt."

Claim 4 is:

"The method defined in claim 1, in which the water used to dissolve said salt has a pH of at least 7."

Claim 7 is:

"The method defined in claim 6, in which the water-soluble alkali metal salt added to one of said materials is an alkali metal carbonate."

Claim 8 is:

"The method defined in claim 6, in which the water-soluble alkali metal salt added to one of said materials is sodium carbonate."

Claim 9 is:

"The method defined in claim 6, in which the water-soluble alkali metal salt added to one of said materials is trisodium phosphate."

Claim 10 is:

"The method defined in claim 6, in which the water used to dissolve said solid sodium chloride has a pH of at least 7."

The first question is whether the practices recommended by Calgon to its customers in the sale to them of an unpatented chemical, sodium hexametaphosphate, constitutes infringement. In the original rejection of October 26, 1944, one of the patents cited by the examiner was the Smith Patent No. 2,108,783,[5] issued February 15, 1938, for a "Process of Separating Inorganic Salts From Solutions." Smith recognized that salt as mined or brines made therefrom contained impurities such as alkaline earth metal salts and salts of divalent heavy metals. Referring particularly to the calcium compounds, he states:[6]

"I have found that the calcium sulphate or other calcium salt present in the solution of sodium chloride as an impurity may be *prevented* from crystallizing out of solution with the sodium chloride upon heating the solution, if an alkali-metal hexametaphosphate is added to the solution. * * *." (Emphasis supplied.)

He further states that he prefers sodium hexametaphosphate.

On November 7, 1944, the Bay Chemical Company was informed of the rejection, whereupon on January 16, 1945, Comstock submitted a report to Mr. Lippman, the plant manager, in which, in discussing the Smith Patent, he said:

"* * * The use of the ionization retardant hexametaphosphate is here shown to be a distinctly different action from the solution inhibitor employed in this application in being of opposite purpose to prevent precipitation rather than to prevent solution."

Lippman, commenting on the Comstock report, submitted a report on March 23, 1945, in which he stated:

"Smith does not add a *precipitant* for calcium radical, but adds a substance which is just the opposite,—that prevents precipitation thereof. This is a firm distinction from Comstock. * * * The biggest distinction, of course, is that sodium hexa-

5. Calgon Exhibit 4 and Defendant's Exhibit 4.

6. Calgon Exhibit 4 and Defendant's Exhibit 4 (column 1, lines 25–31).

metaphosphate is not a precipitant for calcium radical, so there would be no conflict in any way with Comstock's process or product claims."

Comstock's comments were sent to Bay Chemical Company's patent solicitors on January 22, 1945, and likewise Lippman's report on March 28, 1945, together with a summary by Lippman dated March 28, 1945, in which he stated: "Smith does not use precipitant for calcium, as his sodium hexametaphosphate *prevents* precipitation of $CaSO_4$."[7]

In support of the amended application of April 25, 1945, the solicitors in their remarks[8] thereon to the Patent Office stated:

> "As to the Smith patent, the claims specifically exclude such compounds as sodium hexametaphosphate. This compound does not precipitate calcium ion but on the other hand maintains the calcium in soluble condition as explained in the patent. The claims, however, call for a compound which precipitates calcium ion from solution."

After the "final rejection" of August 19, 1946, they were permitted to file the amended application of February 3, 1947, in which the old claims were cancelled and a rewritten group submitted which included the ten claims ultimately allowed. As will be noted in the claims set forth, supra, the agent (a water-soluble alkali metal compound or salt) was required to be one "which reacts with calcium sulfate in aqueous solution to precipitate a water-insoluble calcium compound." In connection with such rewritten application the solicitors as shown by the file wrapper[9] again argued that

> "The patent to Smith is irrelevant to the subject matter of the process claims as it deals with the addition of sodium hexametaphosphate to brine to actually hold the calcium in solution instead of precipitating it. *The sodium hexametaphosphate is not an alkali metal compound which will react with calcium sulfate to precipitate an insoluble calcium compound in aqueous solution* and this patent has no bearing on the present invention." (Emphasis supplied.)

It is difficult to imagine a clearer statement of a disclaimer of any intent to include sodium hexametaphosphate within the group of compounds constituting the agent within the language of the claims as they had been amended. In fact, it is very clear that the purpose was to convince the examiner that the language of the claims as amended could not be construed as including sodium hexametaphosphate within its terms.

Morton objects to the use of the Patent Office file wrapper. The fallacy of this position is well stated by Judge Kirkpatrick in Mall Tool Co. v. Quaker Vibrators, Inc., D.C.E.D.Pa., 30 F.Supp. 841, 842, as follows:

> "* * * The negotiations between the parties to a contract (which, in the case of a patent, are found in the file wrapper history) may be examined by the Court to supply an interpretation of a claim of doubtful meaning. Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 26 L.Ed. 149.
>
> "Thus it would seem that the applicant's intention or understanding in this case is immaterial if the examiner who finally allowed the claim was led to believe or would reasonably understand that the applicant meant something different."

Such use of the file wrapper including the "explanatory remarks", when submitting amendments, has been repeatedly approved.[10] And as Judge Biggs in

7. The foregoing facts appear under the respective dates in the correspondence file, Joint Exhibit 5.

8. Calgon Exhibit 2, Page 27.

9. Calgon Exhibit 2, Page 44.

10. Weber Electric Company v. E. H. Freeman Electric Company, 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162, affirming 3 Cir., 262 F. 769; Union Carbide & Carbon Corp. v. Graver Tank & Mfg. Co., Inc., 7 Cir., 196 F.2d 103, 109.

Lanova Corporation v. National Supply Co., 3 Cir., 116 F.2d 235, 238, stated: "These facts present a plain case of file-wrapper estoppel, * * *." What appears in the file wrapper history in the present case constitutes a disclaimer by Comstock and the patentee is estopped from placing any other interpretation upon his amended claims.[11] Therefore, as a matter of law, the claims of the Comstock patent "specifically exclude such compounds as sodium hexametaphosphate."

On the question of noninfringement, however, it is not necessary to rest the determination solely on estoppel. It does not appear, factually, that Calgon's sale of sodium hexametaphosphate constitutes infringement. The Calgon recommendation for the use of sodium hexametaphosphate varies from 5 PPM, based on the dissolving water, up to 150 PPM, with the amount generally falling in the narrower range of 25 to 50 PPM. In the Comstock Patent the recommended range for the agents falling within the phosphate and carbonate groups "which react with calcium sulfate in aqueous solution to precipitate a water-insoluble calcium compound" is approximately 168 PPM to approximately 684 PPM. Particular reference is made by Comstock to trisodium phosphate and sodium carbonate in claims 7, 8, and 9, and could have no application to the present question of infringement. Claims 4 and 10 require that the water have a pH of at least 7. Such a requirement forms no part of any recommendations by Calgon and these claims have no applicability. As already indicated, the amount of agent (referring here to the sodium hexametaphosphate chemicals sold by Calgon) recommended by Calgon is not within the range of Comstock's claims 2, 3, and 6, which are therefore likewise eliminated. We need consider only claims 1 and 5. As stated by one witness,[12] Calgon had been selling the metaphosphates at least as early as 1940. Sodium hexametaphosphate is a well-known chemical as to which it was pointed out in a standard text[13] as early as 1891 that "the precipitation of calcium by the alkali carbonates is completely prevented or considerably interfered with by the presence of alkali * * * metaphosphates * * *." This, as already indicated, is the basis of Smith's application in 1936, namely, that the addition of an alkali-metal hexametaphosphate to a brine solution containing calcium compounds as impurities did not precipitate the calcium as an insoluble compound but held it in solution so that the sodium chloride could be precipitated or crystallized out of solution without the impurities accompanying it. This was likewise confirmed by plaintiff's expert, a chemist of long experience with the phosphates, who, following the range of the patent, fully demonstrated that trisodium phosphate and sodium carbonate, an alkali metal phosphate and alkali metal carbonate specifically referred to by Comstock, when used in accordance with Comstock did "react with calcium sulfate in aqueous solution to precipitate a water-insoluble calcium compound" whereas the metaphosphate did not. Bay Chemical's chemist, on the other hand, performed an experiment so completely in disregard of the conditions involved in the Comstock patent as to be worthless. It did, however, prove that a temporary "cloudiness" which could be produced by the metaphosphate under extreme and inapplicable conditions was not a precipitation of a water-insoluble calcium compound within the claims of the Comstock patent. Both as a matter of law and of fact it must be held that

11. Smith v. Magic City Kennel Club, Inc., 282 U.S. 784, 789–790, 51 S.Ct. 291, 75 L.Ed. 707; Exhibit Supply Co. v. Ace Patents Corporation, 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736; Kausal v. American Seating Co., 3 Cir., 56 F.2d 557, 558; Crescent Dental Manufacturing Co. v. S. S. White Dental Manufacturing Company, D.C.E.D.Pa., 144 F.Supp. 1, 4.

12. Trial testimony, Page 31.

13. Trial Testimony Page 57 and Calgon Exhibit 10.

the Comstock patent has not been infringed by Calgon.

The remaining question is whether the Comstock patent is valid. The nature of the patent and the claims have already been discussed.

Pure salt (sodium chloride) is largely obtained from native rock salt which is found in natural deposits in various parts of this country as well as elsewhere. Such rock salt contains various impurities. Some of these are soluble compounds, the calcium compounds including calcium sulphate being among those commonly present. Gerrard in his patent, to which reference will be had, in 1909 said,[14] "Natural salt contains impurities, mainly calcium sulphate and usually traces or a small percentage of magnesium and/or calcium chlorides." A brine was formed by adding water to the rock salt after it was mined, or, depending on the nature of the deposit, in some cases the water was pumped into subterranean salt deposits, dissolving the salt and bringing it back to the surface as brine. It was common knowledge that the calcium impurity could be removed from such brine by precipitation through the use of the various carbonates, phosphates and silicates. Comstock knew this. He states:[15]

> "* * * In conventional processes of making such pure brines it has been the practice to form a brine by dissolving crude salt in water and then add certain reagents to the brine, in order to precipitate the undesired compounds. For example, calcium has been precipitated as calcium carbonate by adding an alkali metal carbonate such as sodium carbonate, * * *."

Ralph E. Hall in an application for patent filed in 1933 with reference to "Water Softening and Washing" states: [16]

> "There are three usual ways now in vogue for softening water. * * The second method is by the use of the so-called water-softening compounds, generally *sodium carbonate* (washing soda), *trisodium phosphate* which is sold under various trade names, lime-soda ash, *sodium silicate,* etc. In these processes the calcium and magnesium are converted, for the most part, into *insoluble salts which are precipitated* * * *." (Emphasis supplied.)

In 1864 Samuel Duffield in obtaining patent for "Improvement in the Manufacture or Purifying of Common Salt" and being concerned with the Bay City and East Saginaw wells in Michigan where calcium chloride was the more troublesome stated:[17]

> "My invention or improvement in the manufacture of common salt consists in the use of a soluble alkaline silicate *for the purpose of separating chloride of calcium or of magnesium from the chloride of sodium* in brines or salines containing such chlorides in solution." (Emphasis supplied.)

Comstock observed that when such precipitating agent was mixed with salt containing such impurities before adding water or was contained in the water when the salt was added, a purer brine resulted than when the precipitant was added to the salt and water solution, or what is referred to as the brine containing the impurities. There is no dispute that it was extremely old to add the agent (carbonates, phosphates or silicates) to the brine as precipitants and filtering the brine to remove the precipitated impurities. In substance, the defendant claims that Comstock made a startling discovery that bringing the impure salt and the water together in the presence of the precipitating agent, that is adding the agent to the impure salt or the water before combining, gave a better result. In his original applica-

14. Calgon Exhibit 2 B, Gerrard Patent, Page 1, Lines 9-10.

15. Calgon Exhibit 1 and Defendant's Exhibit 2 (Column 1, Lines 13-20).

16. Defendant's Exhibit 1 (Column 1, Line 48 to Column 2, Line 6).

17. Calgon Exhibit 3 (Column 1, Lines 17-22).

tion Comstock appears to use the words "inhibit" and "precipitate" interchangeably in discussing the phenomena that occurs. As his application progressed (or rather suffered setbacks) he substituted the word "inhibit" by amendment in numerous places for the term "precipitate" and sought to claim the theory of nonsolubility of the impurities by the *coating of the crystals* [18] or inhibition as his great discovery. Fundamentally, we are here dealing and starting, in any instance, with impure salt whether it be mined or obtained as brine and recrystallized, nor would it matter whether some of the impurities had already been removed. The method is applicable to impure salt containing *calcium compounds.* Comstock states:[19]

> "The step of dissolving the sodium chloride containing calcium sulfate so as to inhibit the dissolving of the calcium sulfate *as well as any other calcium compounds which may be present* may be carried out in substantially any desired manner so long as the inhibiting agent is present during the dissolving operation. Thus water containing the inhibiting agent may be added to a body of salt or conversely the crude salt can be added to a body of water and the dissolving operation may be carried out with or without agitation. Alternatively the inhibiting agent can be added to the impure salt either in powder form or as a concentrated solution and the dissolving operation carried out as above described. The impure solid salt containing the inhibiting agent can be made and sold as a product of commerce so that purchasers may make the purified brine of the present invention by merely adding water and then filtering or settling." (Emphasis supplied.)

In 1860 Thomas Spencer concerned with the salt obtained in Michigan where the impurities of chloride of calcium (a calcium compound) and of magnesium predominated and seeking a solution for deliquescence, or as he puts it,[20] "The accumulation of dampness, and consequent lumping of the ordinary table-salt," patented his "method" of producing from a salt containing impurities a less moisture absorbing product. He states:[21]

> "* * * I add in any convenient way a quantity of the carbonate or bicarbonate of soda, and incorporate the salt therewith by grinding them together or otherwise causing them to mix, so that an equivalent of the carbonate or bicarbonate of soda shall be brought into contact with the foreign matters aforesaid sufficient to convert the same into chloride of sodium (sic) (common salt) and carbonate of lime, a harmless impurity, * * *.
>
> "It is obvious that there are many ways of bringing the carbonates into contact with the impurities surrounding the crystals of salt. That which I believe to be simplest and cheapest is to mix the two by stirring and grinding, * * *."

True, Spencer had not made an extensive research of the calcium compounds nor gone into an analysis of all the results and uses, nevertheless, had he, as set forth in his "claim", added "the carbonate or bicarbonate of soda, so as to unite the same with the impurities," Comstock's as well as Spencer's purpose would have been accomplished.

In 1864 Duffield obtained a patent [22] for "Improvement in the Manufacture or Purifying of Common Salt." Duffield employs an alkaline silicate, sug-

18. Calgon Exhibit 1 and Defendant's Exhibit 2 (Column 7, Line 5).

19. Calgon Exhibit 1 and Defendant's Exhibit 2 (Column 7, Lines 54–73).

20. Calgon Exhibit 2 B, Spencer Patent, Column 1, Par. 2.

21. Calgon Exhibit 2 B, Spencer Patent, Column 2, Line 6.

22. Calgon Exhibit 3.

gesting two methods. Dealing, as did Spencer, with "such salines as occur at East Saginaw and Bay City wells in the State of Michigan" where the predominant calcium compound is calcium chloride, he suggests as one method[23] the treating of the salt brine containing the impurities "with a solution of soluble alkaline silicate in the proportion of two parts of anhydrous silicate to one part of anhydrous chloride of calcium or magnesium. A chemical interchange then takes place, the silicate of lime and magnesia being formed, and also chlorides of potassa or soda. *As these silicates are insoluble, they form a precipitate* which is easily removed, while the common salt remains in solution. When the precipitate subsides, the brine is either decanted or filtered off, and then evaporated, and thus the salt is obtained very pure." (Emphasis supplied.) However, he did not stop there, he added:

> "*Instead of treating the brine with a solution of the silicate, the impure common salt may be heated or fused with the anhydrous silicate of potassa or soda, and water then added to dissolve the fused mixture and thus the impurities be removed from the salt.* Other silicates may be employed, * * *." (Emphasis supplied.)

Comstock substitutes the well-known alkali carbonates and phosphates which react in aqueous solution to precipitate a water-insoluble calcium compound.

Likewise, in 1908 one George T. Holloway obtained Patent No. 902,403 for a "Process for the Preparation of Common Salt for Domestic and *Other Uses.*"[24] (Emphasis supplied.) He states:[25]

> "This invention relates to the preparation of common salt so that its tendency to cake on exposure shall be precluded. This caking is, as is well known, due to the presence of the chlorids and other deliquescent salts of calcium and magnesium, and the present invention consists *in coating the prepared granules* or crystals of common salt with finely powdered carbonate of soda for the purpose of converting the deliquescent chlorid or *other compound of calcium or magnesium at or near the surface of the crystals or granules only* into the non-deliquescent carbonate."

Webster's definition of "deliquesce" is "to melt away; specif., to dissolve gradually and become liquid by attracting and absorbing moisture from the air." Holloway speaks of the desired result as non-deliquescence. Comstock speaks of the result as water insolubility and terms it inhibition. Holloway states:[26] "the carbonate of soda, which may be either the normal anhydrous carbonate or the bicarbonate or other of the ordinary forms of carbonate," thus including the carbonates generally. Of greater significance than his "process", however, is Holloway's comment[27] that

> "In the manufacture of common salt it has long been known to add sodium carbonate to the brine before the common salt is crystallized out. It is however found that the comparatively pure salt thus produced still cakes together on keeping. *Furthermore it is known to grind common salt with carbonate of soda so that the reaction with the calcium and magnesium salts takes place in the solid state,* * * *." (Emphasis supplied.)

If we state that this product can be sold to persons desiring to make brine (which may be included under the "other uses" of Holloway's caption) it leaves

23. Calgon Exhibit 3 (Column 1, Line 32).

24. Calgon Exhibit 2 B.

25. Calgon Exhibit 2 B (Column 1, Lines 11–24).

26. Calgon Exhibit 2 B (Holloway Patent, Column 2, Lines 56–59).

27. Calgon Exhibit 2 B (Holloway Patent, Column 1, Lines 25–34).

nothing new in Comstock's statement already referred to that "the impure solid salt containing the inhibiting agent can be made and sold as a product of commerce so that purchasers may make the purified brine of the present invention by merely adding water and then filtering or settling."

In 1909 Cornelius Gerrard applied for a British patent for "Improvements in the Method and Process of Treating Salt and Bye-products." He has reference [28] to the treating of salt that has been "made, manufactured, or produced from sea water, dissolved rock salt, or from brine (natural or purified) or from ground rock salt." He states:[29] "Natural salt contains impurities, mainly *calcium sulphate*, and usually traces or a small per centage of magnesium and/or calcium chlorides." (Emphasis supplied.) He proposes treating salt by *coating*.[30] He prepares a solution of sodium carbonate or phosphate to be "utilized in forming a deposit on the crystals and *bye-products*,"[31] (emphasis supplied), treating the salt "either by pouring the prepared solution over the salt or by passing the salt through the prepared solution," and he adds, "and by recovering such of the prepared solution employed in excess of what is utilized." Gerrard is not interested in obtaining a pure brine but in obtaining a salt in which there is a water-insoluble coating on the by-products to prevent deliquescence rather than solution. To accomplish this difference in approach he adds sodium chloride to the solution ("agent" of Comstock) to the point of saturation, to prevent the sodium chloride from going into solution. Gerrard in 1909 was merely taking one step beyond Comstock.

The most significant statement [32] in Gerrard in discussing that which had already been done to create insolubility or non-absorption of moisture within the term deliquescence, is that "With a view to ensure the salt remaining dry and free it has been proposed to specially prepare it by adding carbonate or phosphate of soda to the salt and form an intimate admixture or trituration of these bodies with the salt crystals while in a solid and finely divided state." Adding water and then filtering and settling must perforce result in the "purified brine" of Comstock. The carbonates and phosphates are the "inhibiting agents" of Comstock and this again is the "impure solid salt containing the inhibiting agent" which "can be made and sold as a product of commerce so that" as Comstock says "purchasers may make the purified brine" by merely adding water and then filtering or settling.

Part of the defendant Morton's practice consisted in the manufacture and sale of pellets of such "agent" to its customers.[33] Such practice of premixing the well-known chemicals with the impure dry salt was old and well known in the art. True, the prior use may have been primarily to obtain nondeliquescence, but just as a patent will protect a holder in his monopoly over whatever use it is capable, so, conversely, there is nothing patentable in the application of an old process to a new use or in the calling of attention to an additional result in the use thereof. Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669.[34]

Defendant stresses that by using the word "inhibit" he was in effect sub-

28. Calgon Exhibit 2 B, Gerrard Patent Page 3, Lines 6–7.

29. Calgon Exhibit 2 B, Gerrard Patent Page 3, Lines 10–12.

30. Calgon Exhibit 2 B, Gerrard Patent, Page 3, Line 46.

31. Calgon Exhibit 2 B, Gerrard Patent, Page 3, Line 49.

32. Calgon Exhibit, 2 B, Gerrard Patent, Page 3, Line 26.

33. Trial Testimony, Pages 115–116.

34. See also Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971.

mitting a new discovery. The simple answer is that the only application under oath was that originally filed and contained the word precipitation in numerous instances where the word inhibiting was subsequently employed, e. g., in Column 1, Lines 32–38, the original application[35] (under oath) stated:

> "In accordance with the present invention it has been found that brines low in sulfate radical as well as calcium radical may be prepared by employing as precipitating agents small amounts of soluble compounds such as alkali metal carbonates or phosphates which form insoluble compounds with calcium radical. * * *."

By subsequent amendment the word "inhibiting" was later substituted. This is only one of many such changes. We must assume that the nature of the claimed invention was not changed thereby. Steward v. American Lava Company, 215 U.S. 161, 168, 30 S.Ct. 46, 54 L.Ed. 139.

Defendant by stressing the effect of forming a solution of the impure salt in the presence of a carbonate or phosphate upon the calcium sulphate impurity is merely trying to separate one of a number of such impurities which have always existed in such impure salt and claim as invention his theory of what occurs to calcium sulphate in the premixing of impure salt and certain agents, namely, carbonates and phosphate, the premixing of which is old in the art. We are not dealing with a new process or method. Kissock v. Duquesne Steel Foundry Co., 3 Cir., 37 F.2d 249.

Defendant also seeks to stress the use of such premixing or solution in the presence of the agent in salt wells. A careful examination of the Patent Office history and the correspondence fails to reveal any indication, even the slightest, that such a use was contemplated by Comstock at the time.

In 1951 Columbia-Southern Chemical Corporation began testing the carbonates, bicarbonates and phosphates at an experimental brine well at Lake Charles, La., and in 1954 obtained from Morton a nonexclusive, royalty-free, irrevocable license.[36] Morton itself showed nothing startling in connection with this phase of its so-called invention. It produced a sample of brine for the Court demonstration which its chief chemist had changed by increasing the calcium sulphate content over five times, so that the courtroom demonstration was far from realistic in so far as the Comstock patent was concerned, but pertinent here is the testimony in regard to the original brine sample as follows:[37]

> "Q. Mr. Miller, going back to that sample of brine and dealing particularly with the brine as you got it out of the well and before you multiplied the calcium sulfate in it, was that brine drawn from the product of a regular operation of the Morton Salt Company? A. Yes, sir.
>
> "Q. Where? A. At Grand Saline.
>
> "Q. And was the water which was pumped to the well a water which had been treated with the inhibiting agent? A. Yes, sir.
>
> "Q. So that under the treatment as you would practice it, that which you call the Comstock process, you were getting a product which contained something like 850 parts per million of calcium sulfate impurity, is that your testimony? A. Yes, sir.
>
> "Q. And that is higher or as high as the rock salt impurity of the untreated salt from the examples

35. Calgon Exhibit 2, Page 3, Lines 10–14.

36. Calgon Exhibit 6.

37. Trial Testimony, Page 126.

given in the Comstock patent, is it not? A. I presume so."

In addition to the foregoing facts revealed by the witness Miller, another Morton employee familiar with the use made of the patent, testified: [38]

"Q. Has Morton Salt Company ever used sodium carbonate, or soda ash alone, that is to say unmixed with other agents in the purification of brine? A. You mean in pre-treatment of the water?

"Q. Yes. A. No.

"Q. Has it ever used tri-sodium phosphate commercially in pre-treatment of the water? A. Now, in asking me that question, when you say Morton Salt Company, do you mean the Morton Salt Company as such?

"Q. I am speaking of the Morton Salt Company as such.

* * * * * *

"A. They have not.

"Q. Then Morton Salt Company for itself has never used either the sodium carbonate or tri-sodium phosphate, is that correct? A. That's right."

Supplementing the foregoing, it must be added that there was no evidence of commercial success which would in any manner affect the determination of the present issue.

The requirement of "a pH of at least 7" in claim 4 adds nothing on the issue of invention. That the pH had a bearing upon chemical reaction was well known. Smith in his patent covering the use of sodium hexametaphosphate points out [39] that "The quantities of sodium hexametaphosphate, for example, which should be used for preventing precipitation of the calcium sulphate will vary according to the pH value of the solution and according to the solubility of the substance whose precipitation is to be avoided."

In view of the foregoing statement of the facts and the law applicable thereto, I must find that there has been no infringement by Calgon of the Comstock Patent now owned by Morton, and that defendant Morton's patent known as the Comstock Patent is invalid.

The foregoing discussion shall constitute my findings of fact and conclusions of law. As to the proposed findings of fact and conclusions of law submitted by plaintiff and defendant, the plaintiff's requested Findings of Fact Nos. 1, 2, 3, 4, 5, 7, 8, 9, 10, 12, and 13 are affirmed and Nos. 6 and 11 are denied; likewise, defendant's requested Findings of Fact Nos. 1, 2, 3, 4, 9, 15, 16, and 17 are affirmed and Nos. 5, 6, 7, 8, 10, 11, 12, 13, 14, 18, 19, 20, 21, and 22 are denied. Plaintiff's requested Conclusions of Law Nos. 1, 2, 3, 4, and 5 are affirmed. Defendant's requested Conclusion of Law No. 1 is affirmed and Nos. 2, 3, 4, and 5 are denied.

Let an appropriate order be submitted in accordance herewith.

38. Trial Testimony, Pages 28–29.

39. Calgon Exhibit 4 and Defendant's Exhibit 4 (Column 1, Lines 44–49).