**ATLAS COPCO AKTIEBOLAG, Plaintiff,**

v.

**INGERSOLL–RAND COMPANY,
Defendant.**

**Civ. A. No. 234–64.**

United States District Court
D. New Jersey,
Civil Division.

Oct. 5. 1967.

Lorentz & Stamler, by Richard M. Goldman, Newark, N. J., for plaintiff; Greer Marechal, Jr., and Robert P. Grindle, New York City, of counsel.

Lawrence I. Lerner, Newark, N. J., for defendant; Hopgood & Calimafde, by John M. Calimafde, Arthur M. Lieberman, New York City, Carl R. Horten, Phillipsburg, N. J., of counsel.

## OPINION

COOLAHAN, District Judge:

Atlas Copco Aktiebolag ("Atlas") brings this action for alleged infringement of U. S. Letters Patent No. 3,085,-638, issued to Jan Larcen, plaintiff's assignor, on April 16, 1963, and hereinafter termed the "Larcen patent." Atlas is a Swedish corporation. It maintains its principal place of business in Sweden, with sales subsidiaries in many other countries, including its American office in New Jersey. The Ingersoll-Rand Company ("Ingersoll") is a New Jersey corporation, with offices here and principal offices in New York City. Both litigants produce a variety of pneumatic tools and equipment; they compete directly in this field throughout the world. The patented device in question relates to pneumatic rock drilling apparatus used for tunneling operations in mining, highway building, and the like.

The original Complaint charged infringement of all ten claims of the Larcen patent, plus unfair competition. Before trial, Atlas withdrew the unfair competition count and Ingersoll withdrew the defense of patent misuse. Additionally, for trial convenience, Atlas designated Claims 4 and 5 as "typical," and it was also stipulated that the damage issue would be deferred pending decision on validity and infringement, both of which were denied by the defendant.

In view of my conclusion that the patent is invalid, it will not be necessary to reach either the issue of infringement or that of damages.

Claim 4 of the Larcen patent discloses a rock drilling machine comprised of three basic components: a pneumatic

rock drill which feeds the drill tool into the rock by percussion, an air conducting hinge which connects the drill and the supporting "feed leg," and a "double acting" feed leg which is essentially a cylinder and piston rod assembly. The feed leg is so termed because it supports the drill and feeds it into the rock face; it is called a "double acting" leg because it is both extended and retracted by pneumatic power.

Claim 4 also discloses appropriate valving to direct air to either side of the piston as desired. Claim 5 complements Claim 4, by specifying that the cylinder portion of the feed leg, rather than the free end of the piston rod, is adjacent to the hinge between the leg and the drill itself. That is to say, the cylinder is the relatively stationary member, while the piston moves in and out of the cylinder, and the free end of the piston rod engages the ground upon extension.

In response to these claims, Ingersoll's first defense is that the patent is invalid because the difference between it and the known state of the art was obvious to one skilled in that art at the time the invention was made. See 35 U.S.C. § 103; Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).[1] A second defense is that the invention was not patentable because it already had been known and used by others in this country. See 35 U.S.C. § 102.[2]

A brief review of the evolution of such rock drills is necessary in order to understand both the patent claims and Ingersoll's defenses. The element of Claim 4 describing a rock drill tool is of little significance; it embodies a standard drill tool construction, for which no patentable status is claimed. At issue is the construction and functioning of the drill feed leg and the controls for the leg, which are located at the back of the drill.

Initially, different types of support apparatus were used for different drilling operations. Thus, for horizontal drilling a "drifter" support was employed. It was comprised of a vertical pole or column engaging the floor and ceiling of a tunnel drift, and a horizontal support or "drill jib" affixed to the pole, which sustained the rock drill and along which the drill was advanced or retracted either by hand or mechanical devices.[3] For vertical drilling into the ceiling, a more complicated vertical support column or "stoper" was arranged between the floor and ceiling, along which the drill could be manually or mechanically advanced.

Later on, both stopers and drifters were improved by incorporating directly

1. 35 U.S.C. § 103, "Conditions for patentability; non-obvious subject matter," provides that:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

2. 35 U.S.C. § 102, "Conditions for patentability; novelty and loss of right to patent," provides that:
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or pat-

ented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
* * * * *
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent.

3. Horizontal drilling into a vertical rock face is traditionally termed "drifting," the resulting tunnel a "drift," and the drilling apparatus a "drifter." Similarly, vertical drilling into the rock ceiling is called "stoping," and the devices employed are called "stopers." The prior art, discussed below, is replete with varieties of stopers and drifters utilizing self-supporting automatic devices to hold the drill and feed it into the rock.

on the rear end of the drill and coaxially therewith an extending pneumatic piston device, which, once the drill was started in a hole, would support and feed the drill by pressure against either the opposite wall (in drifting) or the floor (in stoping). However, these stoper and drifter drill supports still had the disadvantage that the drilling had to be stopped and the vertical or horizontal support periodically moved as the drill advanced; or, alternatively, the drilling had to be stopped while drill bit extensions were added so the supporting apparatus could be left in place. Furthermore, different supporting devices for horizontal and for vertical drilling had to be available, transported to the fresh end of the tunnel, set up for drilling, removed during blasting, and then transported again to the new tunnel end.[4]

Some time during the late nineteen-forties a more versatile feeding support was developed to supplant the conventional stoper, drifter, and drill jib feeding and supporting devices. This was a pneumatically extendible piston feed leg pivotally connected to the rock drill. The pivoted leg supported the drill from the tunnel floor, forming an obtuse angle with the drill's axis; whether horizontal drifting or vertical stoping was involved, this arrangement provided enough leverage to feed the drill in the desired direction as the feed leg was pneumatically extended. Such a device is sometimes called a "jack drill."

Jack drills not only can be used for either stoping or drifting, but they are also less cumbersome to reposition. However, the operator still must stop the drill in part with his hand (since the drill itself cannot hang completely free at the end of the long drill steel in the hole), retract the telescoping leg and swing it down to an advanced purchase further along the tunnel floor toward the rock face.

Plaintiff's device is primarily directed toward this problem. The pivoted feed leg disclosed by the Larcen patent can be pneumatically retracted as well as extended, i. e., is "double acting," without the operator removing his hands from the drill. A reversal of air pressure from one side of the piston to the other within the cylinder causes the feed leg to contract in the direction of the drill and then drop down to pick up an advanced purchase with a claw attachment at the free end of the piston rod. The operator then extends the leg once more, thus feeding the drill further into the rock without interruption.

Atlas claims two subsidiary improvements. By having the air enter the leg through a trunnion in the pivoting hinge between the leg and the drill, the same power supply is used for both, and the controls for the leg can be collocated at the back of the drill tool. Thus the entire apparatus can be controlled without moving one's hands from the drill controls.

Second, placing the cylinder at the top of the leg adjacent to the hinge, with the piston rod extending from it to the ground, prevents drilling debris and water from entering the seal where the piston rod emerges from the cylinder. The wear thus avoided was a drawback of some feed leg designs which positioned the piston rod at the top of the leg adjacent to the drill, with the cylinder below it next to the ground.

Atlas admits that double acting cylinders, *per se*, were known in the earlier drifter art for feeding drills into the rock face. Further, it concedes that pivoted hinges had been employed to connect jack drill feed legs to the drill tool, albeit not as freely pivoting as its own

4. The standard tunneling procedure is to drill a pattern of holes into the vertical walls or end, the ceiling, or even the floor of the tunnel, into which blasting charges are inserted to dislodge rock or mined ore. The debris is then removed and a new pattern of holes is drilled. In this context, the ease and rapidity of the successive drillings is important because labor costs are one of the major tunneling expenses, and the workmen involved in placing the charges or removing debris must wait while new holes are drilled.

hinge, and that some jack drills also were designed with the cylinder above the piston rod to prevent debris wearing on the piston seal.

Hence, the essence of its claim is that while there was some prior art disclosure of each of the several elements and principles embodied in the Larcen invention, their effective integration was a nonobvious innovation. It contends that Larcen's feed leg was an important advance over the prior art addressed to the above mentioned problems, since there had been no workable combination of the double acting leg, the fully pivoting hinge, and the single air supply for both drill and feed leg control, with an inverted cylinder.

Ingersoll replies that these elements neither singly nor collectively merit the legal monopoly bestowed by a patent: not only was each feature-double acting leg, inverted cylinder, and common air supply hinge trunnion-known in the art, but also their combination was merely a matter of mechanical rearrangement, an aggregation of old elements whose cooperation achieves no unobvious breakthrough. In addition, Ingersoll claims that even the combination was anticipated in prior art.

Against this general background, the following are this court's findings of fact and conclusions of law in regard to the prior art, the advance represented by Larcen's claims, and the importance and nonobviousness of that advance.

## FINDINGS OF FACT

1. Double acting piston-cylinder supporting feeds had been widely employed in the drilling industry prior to the claimed date of Larcen's invention. The following prior patents disclose rock drilling mechanisms which employ such double acting feed legs. (Tr. 122–29, 180–87, 199–200).

   (1) Pat. No. 1,175,745—Gilman (not cited by the Patent Office in regard to Larcen's application)

   (2) Pat. No. 2,296,819—Osgood (not cited by the Patent Office)

   (3) Pat. No. 2,078,780—Slater (not cited by the Patent Office)

   (4) Pat. No. 1,898,999—Hulshizer (cited by the Patent Office)

   (5) Pat. No. 1,902,574—Nell (not cited by the Patent Office).

2. Rock drills utilizing both single acting and double acting support legs had been in general public use prior to Larcen's application. (Tr. 256–86, 330–33, 381–85).

3. The prior double acting feed supports in stoper and drifter arrangements performed the same basic function as the double acting feed leg shown in the Larcen patent. (Tr. 136, 187, 329, 354, 357). Plaintiff did not establish that the mechanical operation of the double acting leg in the Larcen patent was novel.

4. The substitution of the conventional double acting feed for the single feed in a jack drill combination produced the obvious expectable result. The substitution would have been obvious to a person skilled in the art who desired the double acting operation in a jack drill. (Tr. 286, 370–71).

Plaintiff's critical assumption is that the prior double acting feeds cannot be invoked to attack the development of a double acting leg in Larcen's jack drill design, because before Larcen's application the industry, according to Atlas, substantially "fore-swore" conventional stopers and drifters—whether single or double acting—and espoused the more versatile jack drill. Hence, Atlas would evaluate the obviousness of Larcen's power retractable feed leg independently of the prior double acting feed legs in stopers and drifters. Ingersoll, on the other hand, views the pertinent prior art as a series of "tool bins," which, at the time of Larcen's application, included double acting drifters and stopers as well as single acting jack drills.

Thus, the litigants' positions on nonobviousness turn as much on their respective delineations of the relevant art as they do on their analysis of the underlying technology. The proper de-

lineation must be rooted in the actual development of the industry, and this court is convinced that designers in the field regarded the entire range of prior drilling apparatus as their starting point from which to combine old elements for new devices. In short, it is plaintiff, not defendant, who seeks to determine the patent on a "conveniently pristine basis * * * divorced from the total development of the art." (Plaintiff's Pre-trial Memorandum, p. 9). Even *assuming* that the industry had completely foresworn self-sustaining drifter and stoper arrangements for jack drills, the state of art did not become a blank slate. The operation of double acting feed devices remained a familiar part of the art which could be called upon by any craftsman to improve defects in single acting feed legs on jack drills.

5. In particular, the testimony of Mr. Jacon Feucht, a stranger to the litigation and an employee of the LeRoi Division of the Westinghouse Air Brake Company, whose experience in the field establishes him as a person skilled in the art, demonstrated the obviousness of Atlas's patent insofar as the double acting leg is concerned.

In 1949, three years before the Larcen application, the LeRoi Company was selling a drifter which contained a rock drill, double acting feed leg, and a hinge with air passages to conduct air from the drill to the feed leg. The drill was pivotally connected to the feed, although the pivotal movement of the drill was circular about the axis of the feed, rather than angular as in the conventional jack drill. (D–14, Tr. 362–63, 383–86).

During 1949–1950, Feucht converted the drifter arrangement into a conventional feed leg rock drill by modifying the hinge to provide for the angular movement in conventional feed leg drills between the double acting leg and the drill. (Tr. 383–88, D–21). He converted the drifter simply to demonstrate the principle of this type of double acting feed leg drill. It could have been modified, employing lighter materials, as a tool suitable for manual handling, but

LeRoi did not manufacture it because in its opinion the market demand would not justify it. (Tr. 389–90).

6. The construction of a feed leg, either double acting or single acting with the cylinder adjacent to the hinge, was well known in the prior art. The Gilman patent discloses this possibility (page 2, lines 29–36). The Nell patent discloses a rock drill in which either the cylinder is attached adjacent to the drill (Fig. 1) or the piston rod. (Figs. 8, 9). Defendant Ingersoll also sold versions of a jack drill prior to the Larcen patents, in which the cylinder was adjacent to the hinge. (Tr. 279, D–8).

7. The prior art also included several designs for feed leg jack drills which contained an air conducting hinge so that the drill and the leg could operate from a common air supply. (Tr. 354–56).

(1) Pat. No. 3,064,741—Morrison (not cited by the Patent Office)

(2) Pat. No. 3,065,806—Thompson (not cited by the Patent Office)

(3) Pat. No. 3,088,530—Feucht (not cited by the Patent Office).

Atlas maintains that the dual passages required in the hinge trunnion for efficient double acting operation of the leg are more difficult to properly position and design, so that the passages remain operable despite the angular movement of the drill relative to the leg and despite the percussive wear to which they are thereby exposed. The particular sealing means employed in the Atlas drill may be an engineering refinement, but the principle was completely anticipated in the aforementioned drifter double acting leg commercially sold by LeRoi prior to the Larcen patent. (D–14, Tr. 383). Furthermore, the vaunted sealing method has acquired prominence for the first time *ante litem motam*, since it is nowhere mentioned in the asserted claims themselves.

8. During the prosecution of the Larcen patent application, Larcen became involved in an interference proceeding with the patents to Morrison, Thompson, and Feucht. Prior to the interference

proceeding and during the initial prosecution of the Larcen application, plaintiff recognized that the mere substitution of a double acting feed leg for a single acting one in a conventional jack drill arrangement did not amount to invention. (D.–1, p. 60). Then, during the interference proceeding itself, plaintiff admitted that the use of an air passing hinge between the rock drill and a feed leg was an exhausted combination and unpatentable. (D–1A, pp. 51–53). See Calgon, Inc. v. Morton Salt Co., 177 F.Supp. 712, 715 (M.D.Pa.1959), and cases cited therein.

9. The prior art also revealed collocation of the air feed control on the rock drill along with the controls for the drill itself. Pat. No. 3,011,569—Dick (not cited by the Patent Office).

10. As will be seen from the above notations, many of the most pertinent prior art patents were not cited by the Examiner; moreover, he did not consider the significance of the LeRoi drifter tool, which was sold commercially and which utilized a double acting feed support and air passing hinge.

11. As one of the signposts of invention, Atlas argues the Larcen patent solved a long-felt unanswered need in the industry. While both parties acknowledge that improved drilling time is important, it is also true from the plaintiff's own history of events, that almost a decade elapsed between the advent of the single acting jack drill arrangements and the work by Larcen on a double acting jack drill. The only prior effort to substitute a double acting leg for a single acting one which appears in the record was by Feucht, who succeeded in demonstrating the possibility. Indeed, the patented drill was the direct response to a specific request from an Atlas customer for a double acting jack drill type tool. (Tr. 228). No substantial evidence was offered to establish that the Larcen patent answered what had been long-felt in the industry as an important problem.

12. The evidence presented by both sides in regard to commercial success was inconclusive. The defendant maintains that its sales of single acting feed leg tools still exceeds those of its double acting ones. Plaintiff testified to the reverse experience. In part, Atlas suggests this is explainable by the fact that mining technology used in many foreign countries makes double acting legs more desirable than does the usual American methodology; Atlas sells a smaller percentage of its drills in the American market than does Ingersoll. (Tr. 419–22, 431, 443, P–22a Nos. 35, 39; Tr. 172–73, D–17, p. 7).

## CONCLUSIONS OF LAW

1. Regarding the standard set forth in the statutes for patentability, I need only note the recent decisions of the Supreme Court and this Circuit in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and Jones Knitting Corp. v. Morgan, 361 F.2d 451 (3rd Cir. 1966). Graham involved a patent on plow construction consisting of a plurality of old elements. The Court assumed that prior art did not anticipate the patented rearrangement, but nevertheless found the patent invalid on the ground that persons having ordinary skill in the art would arrange the parts as did Graham to achieve the desired result. The Court's reasoning is squarely in point here. Indeed, one aspect of that case is particularly reminiscent of Larcen's claim for the inversion of the cylinder and piston rod to reduce wear on the piston seal. In Graham, the Court rejected the claim that mere inversion of the plow shank and hinge plate to permit freer flexing of the shank was an unobvious advance to one familiar with standard plow construction. And that is the case here, where inversion was not only theoretically apparent but had been utilized.

2. The main teaching of Graham and its companion case is that 35 U.S.C. § 103 was not meant to establish a new standard of patentability, but was rather intended to codify prior case law which placed emphasis on the degree to which the

invention would have been readily apparent to one skilled in the art, 383 U.S. at 14, 86 S.Ct. 684; see Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850). By explicitly codifying this standard, Congress sought to emphasize "nonobviousness" and discourage the former search for some mystical quality of "invention." Thus, to be patentable any invention need only be novel and useful *and also* a nonobvious advance over the prior art. The simplicity or difficulty with which the invention is accomplished is not the test of patentability. Goodyear Tire and Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944). Nor is a "flash of genius," Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941), required; the last sentence of Section 103 was specifically designed to negate that frequently used standard. Graham v. John Deere Co., supra, 383 U.S. at 15, 86 S.Ct. 684.

3. To incorporate a double acting feed leg, an air conducting hinge, inversion of the piston and cylinder arrangement, and collocated controls on the drill was not to make a patentable invention within the meaning of Section 103, supra, because it would have been obvious to one skilled in the art within the meaning of the statute and case law.

The majority of the novelty attributable to the Larcen combination stems from the employment of a double acting feed support in a leg which telescopes and then advances to a new purchase rather than retracting the drill as earlier double acting feeds did. Hence, plaintiff is forced back to wholly semantical arguments that its double acting leg involves a different principle of extension and retraction, i. e., that upon telescoping the leg, it is the ground engagement rather than the drill tool which is "retracted" and the overall result of the repeated double action is to advance the drill.

Be that as it may, the hard fact remains that manually telescoping—but power extendible—feed legs were ad-mittedly known as jack drills. Thus, the principle of telescoping the leg to advance it to a new purchase was no innovation. Atlas must still show that it would not have been obvious to utilize a double acting cylinder-piston device to automate the retraction for this purpose. In light of the prior art discussed hereinabove, its inability to do so is, to coin a phrase, patent.

4. Moreover, the above described development of the technology disclosed by prior art in drifting and stoping suggests no limitation on their applicability to a particular type of drilling apparatus. This is a far clearer situation of pertinent prior art than the Supreme Court found in Jungerson v. Ostby and Barton Co., 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235 (1949).

5. The LeRoi device produced and commercially sold, as modified by Feucht's experimentation to provide angular rotation between the double acting feed leg and the rock drill, substantially presaged all the valid claims advanced on behalf of the patent in suit. It is unnecessary to decide whether this device, in conjunction with the other prior art, completely anticipated the patent sufficiently to satisfy 35 U.S.C. § 102, since the standards of Section 103 are not met. However, the LeRoi-Feucht modified drifter is a relevant indicator of obviousness. As Judge Forman's scholarly dissent in the *Jones* case, emphasizes, there is a clear distinction between evidence of prior art being inadequate to support a finding of prior "public use" or knowledge and the defense of anticipation, on the one hand, and its being probative on the issue of nonobviousness, on the other.

6. The particular combination disclosed by Larcen commits the fundamental vice of subtracting rather than adding to the available pool of known technology by virtue of its monopoly. Analysis of such combination patents is beset with semantical pitfalls; the terms "aggregation" and "patentable combination", often juxtaposed, are but shorthand references to the requirement

that the collection of known elements produce a novel and nonobvious result in order not to be a net loss to society. See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Graham v. John Deere Co., supra, 383 U.S. at 6, 86 S.Ct. 684. As the Court stated in the *Great Atlantic & Pacific Tea Co.* case:

> Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements * * * with no change in their respective functions * * *.

Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., supra, 340 U.S. at 152, 71 S.Ct. at 130.

To be sure, most inventions are, in a sense, combinations of some known elements, whose unobviousness stems from the ingenuity of their cooperation, rather than any one member functioning in a startlingly different way, Safety Car Heating Co. v. General Elec. Co., 155 F.2d 937, 939 (2nd Cir. 1946) (L. Hand, J.), but the mere combination of existing elements into an attractive working product with improved performance of a previously used method does not meet this test.

7. While the patent grant by the Patent Office still gives rise to a presumption of validity, the effective force of that presumption has been substantially weakened by the plethora of decisions recognizing "the notorious difference" between the loose standards applied by patent examiners in approving patented unpatentables, and the standards applied by the courts in dispatching them. Graham v. John Deere Co., supra, 383 U.S. at 18, 86 S.Ct. 684; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., supra, 340 U.S. at 156, 71 S.Ct. 127 (Mr. Justice Douglas concurring); Packwood v. Briggs & Stratton Corp., 195 F.2d 971, 974 (3rd Cir. 1952).

Moreover, the presumption is further weakened to the extent that the examiner has not considered the most relevant aspects of prior art relied on by the alleged infringer. L. B. Smith, Inc. v. Hughes, 190 F.Supp. 787, 797 (E.D.Pa.1961) aff'd per curiam, 296 F.2d 738 (3rd Cir. 1962), cert. denied, 370 U.S. 953, 82 S.Ct. 1603, 8 L.Ed.2d 819.

To the extent that the presumption retains vitality here, it has clearly been met and overcome by the evidence. The presumption never usurps the court's ultimate province to declare compliance or noncompliance with the statutory standards.

Let an appropriate order be submitted.